UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:

GEK Realty and Home Improvement LLC,

                    Debtor.
------------------------------------------------------------X

Chapter 11

Case No. 17-40228-nhl

**DECISION DETERMINING CLAIM AFTER EVIDENTIARY HEARING**

APPEARANCES:

Douglas J. Pick, Esq.
Eric C. Zabicki, Esq.
Pick & Zabicki LLP
369 Lexington Avenue, 12th Floor
New York, NY 10117
*Attorneys for the Debtor*

Jason S. Leibowitz, Esq.
Daniel N. Zinman, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
*Attorneys for BHMPW Funding LLC*

HONORABLE NANCY HERSHEY LORD
UNITED STATES BANKRUPTCY JUDGE

Before the Court is the motion (the "Motion") of GEK Realty and Home Improvement LLC (the "Debtor" or "GEK"), seeking to expunge or reduce the claim asserted against the Debtor by BHMPW Funding LLC ("BHMPW" or "Creditor") by way of its Proof of Claim No. 3 filed in this case (the "Claim"), pursuant to 11 U.S.C. § 502 and Rule 3007 of the Federal Rules of Bankruptcy Procedure,[1] and the responses thereto. *See* Mot., ECF No. 50; Cr.'s Resp., ECF Nos. 80, 88; Db.'s Reply, ECF No. 81.

The Court held an evidentiary hearing on the matter, at which counsel for the Debtor and counsel for the Creditor appeared and were heard, and testimony was taken. *See* June 11 Trial Tr., ECF No. 131; June 26 Trial Tr., ECF No. 122. Thereafter, the parties each submitted post-trial briefs in lieu of closing arguments, and the matter was subsequently taken under advisement. *See* ECF Nos. 126–27, 134.

For the reasons set forth below, the Motion is granted in part and denied in part, to the extent that the total allowed amount of the Claim as of the Petition Date is: $723,499.85.

## JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(1), and the Standing Orders of Reference in effect in the Eastern District of New York dated August 28, 1986, and as amended on December 5, 2012, but made effective *nunc pro tunc* as of June 23, 2011. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J). This decision constitutes the Court's findings of fact and conclusions of law to the extent required pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

---

[1] Unless otherwise indicated, all statutory references are to 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and references to rules are to the Federal Rules of Bankruptcy Procedure (the "Rules").

# BACKGROUND

## *Relevant Procedural History*

On January 19, 2017 (the "<u>Petition Date</u>"), the Debtor filed a voluntary chapter 11 petition under the Bankruptcy Code.  The Petition was signed by Gregory Carmichael ("<u>Carmichael</u>"), as Managing Member of the Debtor.[2] Pet., ECF No. 1.

On July 18, 2017, BHMPW filed its Claim in the Court's Claims Register, asserting a secured indebtedness in the sum of $782,351.67 as of the Petition Date.  The Claim is broken down as follows:

| | |
|---|---|
| Unpaid Principal Balance | $700,000.00 |
| Interest | $105,000.00 |
| Default Interest | $97,766.67 |
| Foreclosure Search | $875.00 |
| Foreclosure Attorneys' Fees | $25,955.00 |
| Foreclosure Costs | $2,230.00 |
| Other Fees (Inspection Fees) | $525.00 |
| Escrow Funds | ($150,000.00) |
| Total Amount of Claim Due as of Filing of Petition 1/19/17 | $782,351.67 |

POC No. 3, Trial Ex. A; Trial Ex. 3.

On December 15, 2017, the Debtor filed a Motion seeking to expunge or reduce the Claim on the grounds that it contains multiple deficiencies, including the failure to: (i) properly apply a payment of $9,503.05 made on November 30, 2015 (the "<u>$9,503.05 Payment</u>"), and a payment of $150,000.00 made on October 11, 2016 (the "<u>$150,000 Payment</u>"), thereby accruing an unwarranted default rate of interest; (ii) attach any support for alleged professional fees of $25,955 incurred in the underlying state court foreclosure action; (iii) attach support for the alleged out of pocket expenses totaling $3,630 constituting: (a) $2,230 for "foreclosure costs," (b) $875 for a

---

[2] The outstanding membership interests in the Debtor are held as follows: (i) Gregory Carmichael (35%); (ii) Karone Carmichael (20%); (iii) Denise Duck (15%); and (iv) Glen Ettienne (30%). *See* Discl. Stmt., ECF No. 60.

"foreclosure search," and (c) $525 for "inspection fees." Mot., ECF No. 50.  The Debtor further

asserts that the Claim intentionally overstates the total amount owed, and that based on BHMPW's

filing of an "unconscionable, deceptive and wrongful claim," it would be inappropriate to charge

the Debtor the contractual default rate of interest. *Id.*  Instead, the Debtor argues that the Court

should exercise its discretion to determine the appropriate amount of interest, and the rate and date

from which it should be calculated. *Id.*

On January 12, 2018, BHMPW filed a response (the "Response") in opposition to the

Motion, ECF No. 80, as amended on January 17, 2018, ECF No. 88, asserting that: (i) both the

$9,503.05 Payment and the $150,000 Payment were properly received and applied by the Creditor;

(ii) support for both the pre-petition legal fees and out of pocket expenses have been attached to

the Response and should be allowed; and (iii) the 24% contractual default interest rate provision

should be enforced.

On January 16, 2018, the Debtor filed a reply (the "Reply") to the Response, ECF No. 81,

contending that the Creditor failed to meet its burden to demonstrate the merits of the Claim, and

that the Court should determine the amount actually owed to the Creditor following discovery and

an evidentiary hearing.

On January 21, 2018, the Court entered a Contested Matter Scheduling Order with respect

to the Motion and the responses thereto, ECF No. 92, as amended by Order entered May 17, 2018,

ECF No. 115.  On June 5, 2018, the parties each filed Pre-Trial Statements in connection therewith,

Db.'s Pre-Trial Stmt., ECF No. 118; Cr.'s Pre-Trial Stmt., ECF No. 119.  The facts of this case

were developed at the evidentiary hearing held over the course of two days through the testimony

of four witnesses, Gregory Carmichael, Monifa Benison, Luis Sepulveda, and Alan Waintraub,

and certain exhibits admitted into evidence.

*Facts*

The Debtor is a New York limited liability company whose principal place of business is located at 111-20 200th Street, Saint Albans, New York 11412.  The Debtor's operations consist primarily of owning and operating the Properties (as defined below), purchasing properties and managing buildings, and acting as a general renovation contractor.

As of the Petition Date, the Debtor owned a two-family residential property located at 403 Jefferson Avenue, Brooklyn, New York 11221 with a value of approximately $1,400,000 (the "Jefferson Property"), and a single-family residential property located at 2750 Pearsall Avenue, Bronx, New York 10469 with a value of approximately $700,000 (the "Pearsall Property" and, together with the Jefferson Property, the "Properties"). Db.'s Pre-Trial Stmt., ECF No. 118; Cr.'s Pre-Trial Stmt., ECF No. 119.

In 2015, Israel Sontag ("Sontag") of The SEF Group, a broker, introduced the Debtor to TBG Funding LLC ("TBG") for a short-term loan to enable the Debtor to acquire the Jefferson Property and to satisfy the mortgages on the Pearsall Property. *See* Db.'s Post-Trial Br., ECF No. 127.

Thereafter, on April 21, 2015, the Debtor executed a Promissory Note (the "Note") in favor of TBG in the original principal sum of $700,000 (the "Loan"). Note, Trial Ex. C; Trial Ex. 1.  The Note was executed by: Gregory Carmichael and Karone Carmichael, each as a Member of the Debtor. *Id.*  To secure repayment of the indebtedness evidenced by the Note, on or about April 21, 2015, the Debtor executed and delivered to TBG a Mortgage and Security Agreement (the "Mortgage"), which encumbered the Properties in the principal sum of $700,000. Mortgage, Trial Ex. 2.

With respect to payments required thereunder, the Note provides, in relevant part:

> PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued and unpaid interest thereon on October 20, 2015 (the "Maturity Date"). In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date on the amount then outstanding, beginning June 1, 2015 in an amount equal to $7,000.00 per month with all subsequent interest payments to be due on the same day of each month after that.

Note, Trial Ex. C; Trial Ex. 1.

The Note provides that interest will accrue at the rate of 12% computed on a 30/360-day basis,[3] which rate increases to 24% upon default. *See id.*

The Note further states that the Debtor may request in writing, a three-month extension of the stated maturity date, provided that the request is made at least 30 days prior to the maturity date and an event of default has not occurred at the time such request is made, in addition to certain other conditions.[4]   The Note also provides that: "[u]nless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs." *Id.*

---

[3] "INTEREST RATE. The interest rate on this Note shall equal the lesser of (a) twelve (12%) percent per annum or (b) the maximum rate allowed by applicable law.

INTEREST CALCULATION METHOD. Interest on this Note is computed on a 30/360 simple Interest basis; that is, with the exception of odd days before the first full payment cycle, monthly interest is calculated by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days. Interest for the odd days before the first full month is calculated on the basis of the actual days and a 360-day year. All interest payable under this Note is computed using this method.
. . .
INTEREST AFTER DEFAULT. Upon an Event of Default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to the lesser of twenty-four (24%) percent or the maximum rate permitted by applicable law." Note, Trial Ex. C; Trial Ex. 1.

[4] "Provided that there has not occurred an Event of Default at the time of such request, or an event which, with the passage of time, would constitute an Event of Default, the Borrower may, at least thirty (30) days prior to the Maturity Date, request in writing an extension (an "Extension Notice") to the Maturity Date of three (3) months. In such event, Borrower shall, simultaneous with the delivery of the Extension Notice, (a) pay an extension fee to Lender equal to one and one half percent (1.5%) of the then outstanding balance due under this Note, (b) deliver an amount equal to $21,000.00, which amount shall be utilized by the Lender to fund Borrower's interest payments on this Note for the interest payment of such extension, which shall be applied in the same manner as prior to such extension, and (c) deliver an amount necessary to pay any real estate taxes and insurance premiums that may become due during such extension period." Note, Trial Ex. C; Trial Ex. 1.

The parties agree that, upon signing the Note and in connection with the closing on the Loan on April 21, 2015, an advance interest payment of $42,000 was retained by TBG from the $700,000 loan proceeds. Db.'s Pre-Trial Stmt. ¶ 7, ECF No. 118; Cr.'s Pre-Trial Stmt. ¶ 7, ECF No. 119. The $42,000 interest payment was paid, in advance, for the months of June, July, August, September, October, and November of 2015. Db.'s Pre-Trial Stmt. ¶ 8; Cr.'s Pre-Trial Stmt. ¶ 8.

At the April 21, 2015 closing, TBG also deducted: (i) a $14,000 origination fee; (ii) a $1,900 appraisal fee; and (iii) $2,978.52 for tax escrow, and had retained a $5,000 "deposit" fee paid by the Debtor prior to the closing date.

In this regard, the Closing Statement dated April 21, 2015 (the "Loan Closing Statement") provides the following with respect to the disbursement of the loan proceeds:

| | **LOAN AMOUNT:** | **$700,000** |
|---|---|---|
| | Less: | |
| 1. | TBG Funding LLC (origination fee) | ($14,000.00) |
| 2. | TBG Funding LLC (appraisal fee) | ($1,900.00) |
| 3. | TBG Funding LLC (interim interest) | ($N/A) |
| 4. | TBG Funding LLC (insurance reserve) | ($N/A) |
| 5. | TBG Funding LLC (interest reserve) | ($42,000.00)* |
| 6. | TBG Funding LLC (environmental fee) | ($N/A) |
| 7. | TBG Funding LLC (tax escrow) | ($2,978.52) |
| | Plus: | |
| 8. | Deposit made by Borrower | $5,000.00 |

> *This amount represents a 6 month interest reserve. Lender shall apply the amount in the reserve to the required monthly payment due under the Promissory Note (the "Note"), of the even date herewith, made by Borrower for the benefit of Lender; provided that in the Event of Default (as defined in the Note), then Lender may apply such amount of the reserve as is necessary so that all required interest payments under the Note are timely made. In such an event, Borrower shall be required to replenish the interest reserve to what it would have been, had Borrower not defaulted. Failure to immediately do so shall constitute an Event of Default under the Note.

> **Net Amount to Borrower (the "Net Proceeds"): $644,121.48**

*See* Loan Closing Stmt. Ex. A, Trial Ex. D (emphasis in original).

On or about November 23, 2015, TBG issued to the Debtor a Payment Statement, dated November 23, 2015, which stated that the total amount due by December 1, 2015 was: $9,503.05 (the "November 2015 Payment Statement"). TBG Nov. 2015 Pmt. Stmt. and Copy of Nov. 2015 Check, Trial Ex. G.

Accordingly, on November 30, 2015, the Debtor delivered to TBG via overnight mail, a cashier's check dated November 30, 2015 in the sum of $9,503.05 made payable to TBG. *Id.* The parties concede that TBG accepted and applied the $9,503.05 Payment, and that there were no payments made between the $9,503.05 Payment and the $150,000 Payment. Db.'s Pre-Trial Stmt. ¶¶ 10–12, ECF No. 118; Cr.'s Pre-Trial Stmt. ¶¶ 10–12, ECF No. 119.

On December 20, 2015, TBG sent the Debtor a letter entitled "Beneficiary Demand for Payoff" (bearing bates stamp TBG_000363) (the "TBG Payoff Letter"). TBG Dec. 2015 Payoff Stmt., Trial Ex. L; Trial Ex. 15; *see* Db.'s Pre-Trial Stmt. ¶ 15; Cr.'s Pre-Trial Stmt. ¶ 15. The TBG Payoff Letter dated December 20, 2015, included a payoff date of December 21, 2015, in the payoff amount of $719,366.74, comprised of $700,000 of unpaid principal, together with "default interest from 10/21/2015 – 12/21/2015" of $14,466.74 and "accrued interest from 12/1/2015 – 12/21/2015" of $4,900, with an interest rate listed at 24%. TBG Dec. 2015 Payoff Stmt., Trial Ex.

L; Trial Ex. 15. The TBG Payoff Letter also stated that interest had been paid through December 1, 2015, and that the next payment was due on January 1, 2016.[5]

Pursuant to an Assignment of Mortgage dated December 22, 2015 and an Allonge to Promissory Note dated December 23, 2015, TBG assigned the Note and Mortgage to BHMPW.

On January 28, 2016, BHMPW commenced an action in the Supreme Court of the State of New York, Bronx County, titled *BHMPW Funding LLC v. GEK Realty and Home Improvement LLC, et al.*, Index No. 32083/2016E, seeking to foreclose the mortgage liens against the Properties (the "Foreclosure Action").

At a hearing held on October 31, 2016 in the Foreclosure Action, Luis Sepulveda ("Sepulveda"), the Debtor's counsel in the Foreclosure Action, delivered a cashier's check dated October 11, 2016, in the amount of $150,000, from the Debtor to Alan Waintraub ("Waintraub"), BHMPW's counsel in the Foreclosure Action. The Debtor had consented to the delivery of the $150,000 cashier's check to BHMPW by Sepulveda. The $150,000 payment to TBG was in connection with a forbearance agreement. Also, *after* said hearing on October 31, 2016, Waintraub emailed a proposed Forbearance Agreement to Sepulveda. Waintraub Oct. 31, 2016 Email and

---

[5] The TBG Payoff Letter dated December 20, 2015 provides as follows:

| | |
|---|---|
| Payoff Date | 12/21/2015 |
| Maturity Date | 10/20/2015 |
| **Next Payment Due** | **1/1/2016** |
| Interest Rate | 24.000% |
| **Interest Paid-To Date** | **12/1/2015** |
| Principal Balance | $700,000.00 |
| Default Interest from 10/21/2015-12/21/2015 | $14,466.74 |
| Accrued Interest from 12/1/2015-12/21/2015 | $4,900.00 |
| Unpaid Late Charges | $0.00 |
| Accrued Late Charges | $0.00 |
| Unpaid Charges | $0.00 |
| Prepayment Penalty | $0.00 |
| Other Fees | $0.00 |
| Trust Balance | $0.00 |
| Payoff Amount | $719,366.74 |

TBG Dec. 2015 Payoff Stmt., Trial Ex. L; Trial Ex. 15 (emphasis added).

Forbearance Agmt., Trial Ex. N; Trial Ex. 9.  BHMPW retained the $150,000 paid by the Debtor. Db.'s Pre-Trial Stmt. ¶¶ 17–21; Cr.'s Pre-Trial Stmt. ¶¶ 17–21.

On February 8, 2018, this Court approved the sale of the Pearsall Property authorizing the net proceeds thereof in the amount of $700,000 to be paid to BHMPW.  On February 13, 2018, a closing was held on the sale of the Pearsall Property and the sum of $700,000 was paid to BHMPW. On April 30, 2018, a check in the sum of $16,486.35 was sent by the Debtor to BHMPW. Db.'s Pre-Trial Stmt. ¶¶ 23–25; Cr.'s Pre-Trial Stmt. ¶¶ 23–25.

## LEGAL STANDARD

A properly filed proof of claim is *prima facie* evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f); *In re Fidelity Holding Co., Ltd.*, 837 F.2d 696 (5th Cir. 1988); *In re Wells*, 51 B.R. 563 (D. Colo. 1985); *In re Nantucket Aircraft Maintenance Co.*, 54 B.R. 86 (Bankr. D. Mass. 1985) (citations omitted).  In order for a claim to be *prima facie* valid, it must comply with the rules, including Rule 3001, and set forth the facts necessary to support the claim. *See, e.g., In re Stoecker*, 143 B.R. 879, 883 (N.D. Ill. 1992), *aff'd in part, vacated in part*, 5 F.3d 1022 (7th Cir. 1993); *In re Cluff*, 313 B.R. 323, 332 (Bankr. D. Utah 2004); *In re Marino*, 90 B.R. 25, 28 (Bankr. D. Conn. 1988); *In re Svendsen*, 34 B.R. 341 (Bankr. D.R.I. 1983) (citations omitted).

The party objecting to the claim has the burden of going forward and introducing evidence sufficient to rebut the presumption of validity. *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 15 (2000) ("[Rule 3001(f)] does not address the burden of proof" in an objection to claim proceeding and is, instead, an evidentiary presumption subject to rebuttal); *see Litton Loan Servicing, LP v. Garvida (In re Garvida)*, 347 B.R. 697, 706–07 (B.A.P. 9th Cir. 2006); *In re Hilliard*, 68 C.B.C.2d 884, 2012 Bankr. LEXIS 4466 (Bankr. D. Mont. Sept. 26, 2012); *In re Cluff*,

313 B.R. at 337.  Such evidence must be sufficient to demonstrate a true dispute and must have probative force equal to the contents of the claim. *In re Wells*, 51 B.R. at 563; *In re Unimet Corp.*, 74 B.R. 156 (Bankr. N.D. Ohio 1987).  Once the objecting party introduces sufficient evidence, the burden of proof shifts to the claimant to prove the validity of its claim by a preponderance of evidence. *Raleigh v. Illinois*, 530 U.S. at 15; *see In re Fidelity*, 837 F.2d at 696; *In re Domme*, 163 B.R. 363 (D. Kan. 1994); *In re Equipment Servs., Ltd.*, 36 B.R. 241 (Bankr. D. Alaska 1983).

## DISCUSSION

### Issues in Dispute

The parties' dispute concerning the validity and amount of the Claim essentially requires a determination as to the appropriate rate of interest chargeable on the Loan obligation; the manner in which certain payments should have been applied; and the propriety of various added fees.

The Debtor maintains that it was not in default on the Loan and that the applicable interest rate should be the contractual non-default rate of 12%.  In support, the Debtor asserts that: it had provided written notice to TBG requesting to extend the maturity date under the Note and TBG had agreed to do so; TBG issued the November 2015 Payment Statement which stated that the amount owed to date was $9,503.05, which was due by December 1, 2015, which payment the Debtor timely made and TBG accepted and applied; and no written demand was ever made upon the Debtor prior to the commencement of the Foreclosure Action for any amounts alleged to be in default.  The Debtor further argues that both the $9,503.05 Payment to TBG and the $150,000 Payment to BHMPW were each improperly applied in that said payments should have reduced the unpaid principal balance and, lastly, that the portions of the Claim seeking attorneys' fees and other costs relating to the Foreclosure Action should not be allowed as part of the Claim.

The Creditor's position is that because the Debtor failed to exercise the extension option under the Note, the Debtor was in default as of the maturity date of October 20, 2015, and that the appropriate interest rate that should apply is the default rate of 24% until the Loan is paid in full. The Creditor asserts that the Debtor made the $150,000 Payment pursuant to the agreed upon proposed Forbearance Agreement, which the Debtor failed to execute, and that the Creditor properly applied said payment in accordance with the terms thereof, i.e., towards any unpaid accrued interest first, then to the unpaid principal balance of $700,000. Finally, the Creditor contends that it met its burden of proof as to the entirety of the Claim, including the foreclosure-related attorneys' fees and other expenses, and that the Claim should be allowed in full.

The Court will address each issue in turn.

1. *The Extension Option Under the Note, the November 2015 Payment Statement, and the* *$9,503.05 Payment*

The Note provides an option to extend the stated maturity date of October 20, 2015 for an additional three months, provided that certain conditions are met. *See* Note, Trial Ex. C; Trial Ex. 1; *see also* n.4 *supra*.

On September 21, 2015, Sontag, the Debtor's broker, sent TBG a written notice by email stating that the Debtor was seeking to exercise its option to extend the maturity date under the Note. *See* Trial Ex. H. The same day, TBG acknowledged receipt of the notice and told Sontag that the new maturity date would be January 20, 2016, and additionally, that the Debtor needed to remit an interest reserve in the amount of $21,000 (representing 3 months' interest); an extension fee of $10,500; and a tax impound of $1,735 to meet the December tax requirements. *See* Trial Ex. I. There were various subsequent emails between Sontag and TBG requesting that the Debtor pay the additional monies for the three-month extension. *Id.*

BHMPW argues that because the Debtor failed to pay these additional sums, it did not exercise the extension option in accordance with the terms of the Note. While the Debtor does not dispute that these sums were not paid, Carmichael testified that he believed that the $9,503.05 Payment was for the extension, and his understanding was that the maturity date had therefore been extended. *See, e.g.*, June 11 Trial Tr. 48, 146, 154–58, 172–73. However, the evidence fails to support a conclusion that the three-month extension had been effectuated. A review of the Note and the evidence presented at trial demonstrate that the Debtor did not properly exercise the option to extend the maturity date for an additional three months, to January 20, 2016, because it failed to submit the required monies in accordance with the terms of the extension provision in the Note.

Further, based on the evidence deduced at trial and the entire record, the Court finds and determines that interest on the Loan should not have begun to accrue at the default rate until January 1, 2016. This is so because, notwithstanding the stated maturity date of October 20, 2015 in the Note, TBG subsequently issued the November 2015 Payment Statement, which set forth the following:

LOAN & PROPERTY INFORMATION
Principal Balance               $700,000.00
Reserve Balance                 ($2,333.33)
Impound Balance                 ($169.72)
Interest Rate                   12.000%
Interest Paid in 2015           $44,333.33
Property Information            403 Jefferson Avenue, Brooklyn NY
                                2750 Pearsall Avenue, Bronx NY

PAYMENT INFORMATION
Statement Date              11/23/2015
Payment Amount       +      $9,503.05
Past Due Payments    +      $0.00
Late Charges Due     +      $0.00
Unpaid Interest      +      $0.00
Unpaid Charges       +      $0.00
Deferred Charges     +      $0.00
**Total Amount Due   =      $9,503.05**
**Payment Due Date          12/1/2015**

13

ACCOUNT ACTIVITY (10/23/2015 – 11/22/2015)
Transaction Date            11/4/2015
Payment Due Date            11/1/2015
Description                 Payment – Thank You
Transaction Amount          $0.00
Balance Forward             $700,000.00
Distribution:
Interest                    $7,000.00
Principal                   $0.00
Late Chgs                   $0.00
Other                       $0.00
Trust                       ($7,000.00)
Principal Balance           $700,000.00

TBG Nov. 2015 Pmt. Stmt. and Copy of Nov. 2015 Check, Trial Ex. G. (emphasis in original).

The November 2015 Payment Statement dated as of November 23, 2015, does not reflect a demand for the full amount due under the Loan obligation, i.e., the entire unpaid principal and interest, if any. Clearly, the issuance of the November 2015 Payment Statement by TBG and the $9,503.05 Payment made by the Debtor, together with TBG's acceptance of said payment, is wholly inconsistent with the later assertions by BHMPW that the default occurred as of October 20, 2015. Unquestionably, in November 2015, TBG listed the non-default rate of interest of 12% and stated that as of November 23, 2015, the total amount due by December 1, 2015 was $9,503.05.

## 2. *Demands for Payoff and Notice of Default*

The Debtor asserts that it had not been provided with payoff statements despite numerous requests for the same. *See, e.g.*, June 11 Trial Tr. 57, 71–76, 96–97, 105, 108–09, 172–73. For instance, Carmichael testified that, prior to making the $9,503.05 Payment, he requested an extension to receive a payoff statement in order to pay off the Loan:

> MR. PICK: Now, prior to having made the 9500-dollar payment, it's 9503.05, to be precise. Did you make a request to extend the loan?
> MR. CARMICHAEL: Yes. I…asked if they'll, um, that I -- (indiscernible) that I wanted to, um, get that extension, 'cause I -- but I wanted a payoff -- a payoff so I could've -- I had someone else. There -- there were a few people I had, that I could

have gotten that money from, um, to pay off, but I -- I never got it. I never got to pay off.

**MR. PICK: So you asked for an extension of the loan?**

**MR. CARMICHAEL: Yes. So that I could pay it off.**

MR. PICK: And did you ask for -- was your intention to obtain a long term extension or a short term extension?

MR. CARMICHAEL: I would have been a short term, because I would have gotten it paid off . . . .

June 11 Trial Tr. 57.

In December of 2015, the Debtor had again requested a payoff statement from TBG in an effort to sell the Properties to pay off the Loan:

MR. PICK: What was the purpose of requesting a payoff statement from TBG in December of 2015? Why did you ask for it, in other words?

MR. CARMICHAEL: Because, um, I had a scattering of offers for, um, the properties. Different people were calling. All types of, um, situations. And I -- I, you know, I says, best thing is to take advantage, now that I can do this.

*Id.* at 71.

Carmichael also testified at trial that the Creditor never issued a written notice of default to the Debtor at any point prior to the commencement of the Foreclosure Action. While the Creditor agrees that it never issued a written notice of default, it asserts that under the terms of the Note, it was not required to do so.

The Debtor argues that the Note is ambiguous concerning the requirement to provide notice. Db.'s Post-Trial Br. 14 n.14. To this end, the only provision under the Note that the Debtor relies on, states as follows: "<u>Insecurity</u>. Lender in good faith believes that the prospect of payment or performance of this Note is impaired or otherwise deems itself insecure; provided that Borrower shall have 15 days to cure any event giving rise to this default, which shall be in Lender's discretion." Note, Trial Ex. C; Trial Ex. 1. However, the Debtor does not cite to any case law to support the conclusion that this clause creates an independent requirement to give written notice of *any* default under the Note.

Rather, the section of the Note entitled "General Provisions" states the following with respect to notices and demands:

> Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor.
> . . .
> All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.

Note, Trial Ex. C; Trial Ex. 1.

Accordingly, when reading the Note as a whole, the insecurity provision contained therein cannot overcome the general provisions that do not require that any notice of default be given and, therefore, the Court finds the Note unambiguous in this regard.

### 3.  *The $150,000 Payment and the Proposed Forbearance Agreement*

According to the trial testimony of Waintraub and Sepulveda, the parties, by their respective counsel, had been in negotiations during the Foreclosure Action in order to settle the litigation.  The parties agree that at a hearing held on October 31, 2016, in the Foreclosure Action, certain settlement terms were agreed upon and stated to the judge, and that the $150,000 Payment was handed to Waintraub by Sepulveda in court at said hearing.  At trial, Waintraub stated that the terms of a forbearance agreement were put forth before the state court judge in open court, but that no record or transcript of said hearing exists. Waintraub explained that the state court "do[es] not have a record taken," but rather, that the judge "took notes." June 26 Trial Tr. 237–44, 250.

Waintraub further testified that the terms had been negotiated with Sepulveda over the phone, but that Waintraub did not actually put these terms in writing prior to the hearing:

> MR. PICK: You said that all the terms were negotiated over the phone, correct?
> MR. WAINTRAUB: Yes, they were.

. . .

MR. PICK: Did you put it in writing?

MR. WAINTRAUB: What? We did not -- we did, we put it in writing, right here in the forbearance agreement.

. . .

MR. PICK: Okay. Did you put any of the terms in writing to confirm anything with Mr. Sepulveda? … Did you put the terms in writing?

MR. LEIBOWITZ: Judge, he's just testified that he gave the forbearance agreement, that's the writing.

THE COURT: No, no, no. He's asking about before.

THE WITNESS: All right. So the answer is we had finalized these negotiations shortly before the court appearance.

**MR. PICK: So the answer is no, you didn't put anything in writing?**

**MR. WAINTRAUB: Yeah, that's correct. In this -- you know --**

**MR. PICK: All right.**

**MR. WAINTRAUB: -- in this circumstance it was not.**

*Id.* at 244–45.

The evidence produced at trial further demonstrates that the written Forbearance Agreement had not been produced *prior* to the October 31, 2016 hearing in the Foreclosure Action. In fact, Waintraub's email to Sepulveda is dated October 31, 2016 at 4:11 p.m., which is *after* the hearing, and the parties testified that this was the first time a written draft of the Forbearance Agreement was provided to Sepulveda.

MR. PICK: Do you recall receiving a copy of this draft forbearance agreement before or after the hearing on October 31?

MR. SEPULVEDA: After.

MR. PICK: So you didn't have these terms with you when you were in court on October 31; is that correct?

MR. SEPULVEDA: Not the terms of the forbearance agreement.

MR. PICK: And did you discuss the terms with the debtor?

MR. SEPULVEDA: Not in court. He wasn't in court.

MR. PICK: Sometime thereafter you discussed the terms -- is it accurate to say that sometime thereafter you discussed the terms with the debtor?

MR. SEPULVEDA: Yes. And we forwarded him a copy of the agreement.

MR. PICK: And did the debtor agree to sign the forbearance agreement?

MR. SEPULVEDA: No, he did not.

*Id.* at 68–69.

17

Waintraub's email to Sepulveda, which was sent after the October 31, 2016 hearing, states

as follows:

> I have annexed the proposed Forbearance Agreement for your review and approval.
> If acceptable, please have your client execute and have the annexed document
> notarized and return 2 originals to me for execution. **Upon receipt of the original
> executed Forbearance Agreement, I will release the $150,000 and we will be
> under the terms of the Forbearance Agreement.**

Trial Ex. N; Trial Ex. 9 (emphasis added).

The Forbearance Agreement provides, in relevant part, as follows:

> 6. **Initial Payment**. Contemporaneously with the signing of this Agreement, the
> Borrower shall make a payment to Lender in the amount of $150,000.00 (the
> "**Initial Payment**"). The Initial Payment shall be applied to the Total Debt at
> Lender's sole discretion. For clarity, upon making the Initial Payment, the Total
> Debt shall be the sum of **$742,485.07** and the unpaid principal balance shall remain
> at $700,000.00. The Initial Payment may immediately be released to Lender and
> shall not cause the Loan Documents to be decelerated in any manner whatsoever as
> further set forth below.
> . . .
> 7. The Borrower acknowledges and agrees that interest will accrue on the unpaid
> principal balance of $700,000.00 at the rate of 24.0% from November 1, 2016, that
> being the default rate as defined in the Loan Documents, until the sums due and
> owing on the Loan Documents are paid off in full.
> . . .
> **22. Counterparts:** This Agreement may be executed in counterparts, each of which
> will be deemed an original document, but all of which will constitute a single
> document. ***This document shall not be binding evidence of a contract between the
> parties hereto until such time as a counterpart of this document has been
> executed by each of the Parties and a copy thereof is delivered to each party under
> this Agreement.***

Forbearance Agmt., Trial Ex. F (emphasis added).

It is undisputed that the Forbearance Agreement, which was provided to the Debtor after

the October 31, 2016 hearing, was never executed. *Id.*; *see also* June 26 Trial Tr. 69. With respect

to the application of the $150,000 Payment, Sepulveda testified as follows:

> MR. PICK: You made that payment to the lender.
> MR. SEPULVEDA: I took the payment to the lender. Yes.

18

MR. PICK: Okay. And was it your understanding that the payment would be applied to the underlying debt obligation?

MR. SEPULVEDA: Pending the execution of the forbearance agreement.

. . .

**THE COURT: I just want to clarify your last answer. It was your understanding that the $150,000 that was paid to the attorney for the lender in court on October 31st was to be applied once the forbearance agreement was executed? Was that what you just testified to?**

**MR. SEPULVEDA: That's my recollection, Judge.**

June 26 Trial Tr. 73–74.

When asked what BHMPW did with the $150,000 Payment, Waintraub testified that BHMPW deposited the check into its bank account pursuant to the terms of the Forbearance Agreement:

**THE COURT: Stop. What did you do with the check is the question.**

MR. WAINTRAUB: Right. Okay. So, the check was taken by me and it was Fed Ex'd to BHMPW because the check is made out to BHMPW Funding.

THE COURT: Okay.

MR. WAINTRAUB: So, it would go to BHMPW. As part of the forbearance agreement, that we agreed in open court.

…

MR. PICK: -- you Fed Ex'd the check the very next day to your client, BHMPW. What did BHMPW do with the check when they received it.

**MR. WAINTRAUB: BHMPW took the check and put it into their bank account.**

**MR. PICK: Okay. They deposited the check.**

**MR. WAINTRAUB: Yes, they deposited the check.**

MR. PICK: Did you ever inquire?

MR. WAINTRAUB: Yes.

**MR. PICK: And what did they say they did with the check?**

**MR. WAINTRAUB: They deposited it in the bank pursuant to the terms of the forbearance agreement we entered into.**

*Id.* at 156–57.

BHMPW contends that it properly applied the $150,000 Payment at its discretion in accordance with the terms of the Forbearance Agreement, which states in relevant part: "The Initial Payment shall be applied to the Total Debt at Lender's sole discretion." Forbearance Agmt. ¶ 6, Trial Ex. F.  When asked about this provision at trial, Carmichael testified as follows:

> MR. ZINMAN: So the forbearance agreement, also provided, in it[s] draft form, for the initial payment to – in this case, to be applied however the lender wanted to the total debt; correct?
> **MR. CARMICHAEL: I did not agree to this. I didn't sign it. 'Cause I looked at it, it's everything this was wrong. When this was shown to me, no date, no nothing, I didn't agree to it.**

June 11 Trial Tr. 178–79.[6]

The evidence at trial clearly shows that, notwithstanding the fact that the Creditor had accepted and deposited the $150,000 Payment purportedly pursuant to the agreed upon terms of the Forbearance Agreement, *the Creditor did not forbear*.  The reason for the Debtor's bankruptcy filing was, in fact, due to the imminent foreclosure sale of the Debtor's Properties by the Creditor. Moreover, Waintraub conceded at trial that "[t]he reason why they filed for bankruptcy is because the judgment of foreclosure and sale was going to be -- was imminent that it was going to be granted," and that essentially the only thing remaining in the Foreclosure Action was to "schedule the auction." June 26 Trial Tr. 170.

Therefore, the Court finds that while the $9,503.05 Payment was properly applied, the $150,000 Payment was not.  BHMPW relies on the Forbearance Agreement as the reason for its: (i) accepting and depositing the $150,000 Payment; (ii) applying it as a "bottom line" credit; and continuing the accrual of default interest thereafter.  But, BHMPW cannot have it both ways. BHMPW cannot assert that it properly received and applied the $150,000 Payment pursuant to the terms of the Forbearance Agreement, when the Forbearance Agreement was never executed, effectuated or otherwise complied with.

Moreover, BHMPW's reliance on the Forbearance Agreement to support its assertions that the Debtor had agreed that the unpaid principal balance at the time was $700,000, accruing default

---

[6] Carmichael testified at trial that he believed that the $150,000 Payment, a "big sum," would reduce the principal balance. June 11 Trial Tr. 97.

interest at 24% as of October 20, 2015, and BHMPW properly applied the $150,000 Payment, is also flawed by the very terms contained therein. The Forbearance Agreement itself states: "*This document shall not be binding evidence of a contract* between the parties hereto *until* such time as a counterpart of this document has been *executed* by each of the Parties and a copy thereof is delivered to each party under this Agreement." Forbearance Agmt., Trial Ex. F (emphasis added).

Finally, notwithstanding the fact that the Forbearance Agreement was never executed, BHMPW never returned the $150,000 Payment to the Debtor. Rather than refunding the payment or even holding the $150,000 Payment in escrow, BHMPW retained and deposited the check. *See, e.g.*, June 26 Trial Tr. 156–57.

Therefore, the Court finds that under these facts and circumstances, equity dictates that the $150,000 Payment should be applied to the unpaid principal balance at the time said payment was made and accepted by BHMPW, thereby reducing the principal balance to $550,000 as of November 1, 2016. Accordingly, the default interest will apply to this reduced principal balance as of November 1, 2016 through the Petition Date of January 19, 2017.

### *Calculation of the Claim and Remaining Amounts Owed*

1. *The Unpaid Principal and Interest Balance as of the Petition Date*

Based upon the foregoing, the Court conducted and applied its own analysis and calculations, using the contractual 24% default interest rate and 30/360-day year under the Note, as follows:

> **Default Interest from 1/1/2016 through 10/31/2016 (304 days)**
> $700,000 * .24 = $168,000
>       = $14,000/mon or
>       **= $466.67/day (at 30 days/mon)**
>
> **$466.67 per diem * 304 days = $141,867.68 (default interest from 1/1/16 – 10/31/16)**

Therefore, the total unpaid balance at the default interest rate as of October 31, 2016 was $841,867.68,[7] as follows:

| | |
|---|---|
| Unpaid Principal Balance: | $700,000.00 |
| Default Interest: | $141,867.68 |
| Total Balance: | $841,867.68 (as of 10/31/16) |

In accordance with the Court's determination above, the $150,000 Payment made to and accepted by BHMPW on November 1, 2016, shall be applied first to the unpaid principal balance. Accordingly, the unpaid principal balance as of November 1, 2016 is reduced to: $550,000 and, together with the unpaid default interest of $141,867.68 as of October 31, 2016, results in the balance of principal and interest due in the amount of: $691,867.68, as follows:

| | |
|---|---|
| New Unpaid Principal Balance: | $550,000.00 ($700,000 – $150,000) |
| Default Interest (through 10/31/16): | $141,867.68 |
| Total Balance: | $691,867.68 (as of 11/1/16) |

With the unpaid principal balance reduced to $550,000, the per diem default interest from November 1, 2016 to the Petition Date calculates as follows:

$550,000 * .24 = $132,000
        = $11,000/mon or
        **=$366.67/day (at 30 days/mon)**

**$366.67 per diem * 79 days = $28,966.67 (default interest from 11/1/16 – 1/19/17)**

Accordingly, the balance of the unpaid principal and interest as of the Petition Date of January 19, 2017 is: $720,834.35, as follows:

| | |
|---|---|
| Unpaid Principal Balance: | $550,000 |
| Default Interest (through 1/19/17): | $170,834.35 ($141,867.68 + $28,966.67) |
| Total Balance: | $720,834.35 (as of Petition Date, 1/19/17)* |

*Excluding the asserted fees and costs relating to the foreclosure action.

---

[7] For purposes of clarity, the Court's analysis first starts with the unpaid principal and interest amounts due and owing under these calculations. The portion of the Claim with respect to the foreclosure-related fees and other expenses, which have no bearing on the principal and interest calculations, are determined below.

Accordingly, the Court finds that the appropriate sum of the unpaid principal and interest (excluding for purposes of this discussion, the balance of the asserted claim for foreclosure-related fees and costs) through the Petition Date is: **$720,834.35**.

2. *Pre-Petition Attorneys' Fees and Other Costs Relating to the Foreclosure Action*

The Creditor's Claim seeks attorneys' fees and other foreclosure-related costs, as follows:

| | |
|---|---|
| Foreclosure Search | $875.00 |
| Foreclosure Attorneys' Fees | $25,955.00 |
| Foreclosure Costs | $2,230.00 |
| Other Fees (Inspection Fees) | $525.00 |
| | $29,585.00[8] |

*See* POC No. 3, Trial Ex. A; Trial Ex. 3.

With respect to the Creditor's entitlement to attorneys' fees and expenses, the Note provides the following:

> ATTORNEYS' FEES; EXPENSES. Upon the occurrence of an Event of Default, Lender may hire or pay someone else to enforce its rights hereunder, at Borrower's sole cost an expense. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorney's fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

Note, Trial Ex. C; Trial Ex. 1.

Upon reviewing the evidence presented, the Court finds that the Creditor has produced sufficient evidence warranting the payment of expenses in the sum of: **$2,665.50**, representing the Foreclosure Costs of $2,230 and the Foreclosure Search of $435.50.   The remainder of the expenses sought in the sum of $964.50 is denied as no supporting evidence of the same has been shown (i.e., the fees and expenses of reviewing the Foreclosure Search of $439.50 and the Inspection Fees of $525).

---

[8] The fees and costs asserted in the Claim, other than attorneys' fees, total $3,630 ($2,230 + $875 + $525).

With respect to pre-petition attorneys' fees, Waintraub's invoice for professional services rendered as BHMPW's counsel in the Foreclosure Action (the "Waintraub Invoice") lists entries beginning on January 18, 2016 and ending on January 8, 2017, together with foreclosure-related expenses (which are also separately included in the Claim) for a total sum of $29,092.50.[9] Trial Ex. Q.  The Waintraub Invoice reflects that Waintraub billed a total of 69.3 hours at the rate of $375 an hour, which amounts to $25,987.50.[10]

As an initial matter, the Court recognizes that a request for a creditor's pre-petition attorneys' fees is not reviewed under the same strict requirements and standards applied to retained bankruptcy-related professionals pursuant to § 330 of the Bankruptcy Code.  However, "[t]he law in this circuit is that no award for attorneys' fees is appropriate where the attorney failed to maintain contemporaneous time records." *Nationstar Mortg. LLC v. Atanas*, 285 F. Supp. 3d 618, 623–24 (W.D.N.Y. 2018) (quoting *Kottwitz v. Colvin*, 114 F. Supp. 3d 145, 150 (S.D.N.Y. 2015) (citing *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983))). This is considered "a strict rule from which attorneys may deviate only in the rarest of cases." *Scott v. City of New York*, 626 F.3d 130, 133 (2d Cir. 2010); *Atanas*, 285 F. Supp. 3d at 623; *see BH99 Realty, LLC v. Qian Wen Li*, No. 10-CV-0693 (FB) (JO), 2011 WL 1841530, at *7 (E.D.N.Y. Mar. 16, 2011) ("The absence of contemporaneous records precludes any fee award in all but the most

---

[9] Also included in said invoice are various fees and costs relating to the Foreclosure Action, totaling $3,105:

| | |
|---|---|
| Summons/complaint | $400 |
| Other court fees (LP, RJI, motion) | $265 |
| Referee's fees | $250 |
| Foreclosure search | $875 |
| Process service | $740 |
| Other foreclosure fees/mailings | $575 |

[10] The Court notes that the difference between the attorneys' fees as listed in the Waintraub Invoice and the Claim is for a de minimis amount of $32.50.

extraordinary of circumstances."), *report and recommendation adopted sub nom. BH99 Realty, LLC v. Qian Wen*, No. 10-CV-693 (FB) (JO), 2011 WL 1838568 (E.D.N.Y. May 13, 2011).

The Waintraub Invoice is seriously deficient in various respects.  Notably, the Waintraub Invoice does not include any contemporaneous time records; instead, each listed entry, whether for a range of dates or a specific date, is lumped with multiple activities.  At trial, Waintraub testified that he does not keep contemporaneous time records:

> **MR. PICK: The first question is, that I have for you, is do you keep contemporaneous time records of your time on a daily basis?**
> **MR. WAINTRAUB: No.** It's not on a daily -- not on a -- on a day-to-day week, we keep -- I keep a log, more or less. But the -- it's not -- it's not a minute by minute log. That's not how I keep my records.
> . . .
> **MR. PICK: When you record your time, do you record it on time sheets?**
> **MR. WAINTRAUB: No. We don't -- we don't do time sheets.**
> . . .
> **MR. PICK: Okay. But you have no contemporaneous records? What you do is you create a best guess estimate of your time on each of the particular matters you work on in a particular day.**
> **MR. WAINTRAUB: I don't think there's any better way. I've been doing this for ten years. I -- that's the -- that's the way that I've been doing it throughout.**

June 26 Trial Tr. 108–09.

Moreover, neither Waintraub nor BHMPW provided any supporting documentation to supplement the Waintraub Invoice in the admitted absence of contemporaneous time records. Waintraub explained that instead of contemporaneous time records, at the end of the day, he has a "list on a scrap piece of paper," and includes an "approximate[]" amount of time that he spends on each matter that is "rounded off," and that he does not bill his clients monthly, but rather, "at the end of file." *See id.* at 108–15.  When asked by the Court to clarify his testimony, Waintraub stated as follows:

> **THE COURT: So, let me see if I understand you. You said -- because I thought I heard two different things. You don't keep contemporaneous time records every day.**

MR. WAINTRAUB: Every -- every day when I'm – when I'm working on matters, I'll have -- you know, I'll have a list on a scrap piece of paper the things that I'm working on.

. . .

THE COURT: -- the end of the day, you might say you're taking hours, an hour, two hours, an hour and a half.

MR. WAINTRAUB: That's correct. And it's -- it's generally it's rounded -- it's rounded off.

THE COURT: Okay. And then --

MR. WAINTRAUB: Because I can't --

THE COURT: -- when you prepare the bill, that is when you go back to that particular day and try to fill in specifically --

MR. WAINTRAUB: No. So --

THE COURT: -- what you did?

**MR. WAINTRAUB: And, so, most of those things -- most of those things -- what I'll then have is I'll have -- I'll know that on that for this -- let's say for this loan, when I -- when it comes time to do a bill, and I don't do a bill until generally the end of a file, okay? That's just the way that I structure my practice.**

**THE COURT: The end of a file, not monthly?**

MR. WAINTRAUB: Right.

THE COURT: Okay.

MR. WAINTRAUB: **Not monthly. We do not bill monthly. So, generally, at the end of a file, or the end of a seminal event, let's say the winning of summary judgment or the completing of a foreclosure, that is when the bills will be prepared. So, I don't bill my clients on a monthly basis. I generally bill them at the end of a file.**

. . .

MR. WAINTRAUB: So, at that time, I will go back and say, okay. I worked on this client these days.

. . .

MR. WAINTRAUB: Then I will -- and these are approximately the hours, right. And then I -- and I prepare a bill that way.

*Id.* at 109–14.

Thus, in the conceded absence of contemporaneous time records or any further "supporting documentation" that "is detailed enough to satisfy the Second Circuit's requirement that attorneys' fees must be based on contemporaneous time records specifying relevant dates, time spent and work done," BHMPW's request for Waintraub's attorneys' fees as part of its Claim must be denied. *See, e.g., Atanas*, 285 F. Supp. 3d at 623 (citations omitted).

26

The portion of the Claim relating to foreclosure-related attorneys' fees and other expenses is allowed in the sum of: **$2,665.50**, and the balance of this portion of the Claim is disallowed.

\* \* \*

Accordingly, the Court hereby finds and determines that the total allowed amount of the Creditor's Claim as of the Petition Date is: **$723,499.85**.

## CONCLUSION

For the foregoing reasons, and upon the entire record of this case and the proceedings had herein, the Motion is granted in part and denied in part, to the extent set forth herein.

The parties are directed to appear at a hearing before the Court for a determination as to the appropriate amount of post-petition interest, if any, to be applied in connection with the balance of the Claim.

A separate order consistent with this decision shall be issued herewith.



Dated: October 3, 2019
      Brooklyn, New York

**Nancy Hershey Lord**
**United States Bankruptcy Judge**

27